WILLIAM R. SMITH & SON, et al., Appellants, v. LOUIS BLOOM, Appellee.

**Commission merchants:** SALES: BREACH OF CONTRACT: RIGHT TO SUE. A commission merchant to whom live-stock has been delivered for sale can make a valid contract of sale without disclosing his principal; and unless his principal objects he can sue in his own name for breach of the contract, or for the purchase price.

**Same:** BREACH OF CONTRACT: DEFENSES: REVIEW ON APPEAL. The fact that a commission merchant had accounted to his principal for the proceeds of a sale, which did not include the expense of reselling after defendant's breach of his contract of purchase, would not constitute a defense to his action for the breach; nor could defendant raise this question for the first time on appeal.

**Same:** USAGE OF BUSINESS: DELIVERY: EVIDENCE. In an action for breach of contract for the purchase of a large number of sheep, in which it was contended that there was not a sufficient delivery to take the contract out of the statute of frauds, evidence of the usual manner in which plaintiff, who handled a great many sheep, selected and set apart those sold to a particular purchaser was competent, as establishing a usage of the business, and as bearing on the question of delivery, although not pleaded as required to authorize proof of a pure custom.

**Foreign laws:** PRESUMPTION. In an action for breach of a contract made in a foreign state, in which the defendant pleaded a statute of frauds of that state, but failed to prove the statute, it will be presumed that the law of the foreign state on that subject is the same as the law of Iowa.

**Sales:** STATUTE OF FRAUDS: DELIVERY: EVIDENCE. The intent to pass title to personalty, with dominion or right of dominion over the same to the purchaser, is a sufficient delivery to take the sale or contract out of the statute of frauds. Evidence of delivery in the instant case is held sufficient to take that issue to the jury.

**Same:** By delivery of personal property under an oral contract of sale, as the term is used in the statute of frauds, is meant an entire surrender of control to the buyer, rather than an acceptance and receipt by him.

**Same:** BREACH OF CONTRACT: RIGHT TO RESELL. Where the purchaser of personalty repudiated the contract on the theory that it was invalid under the statute of frauds, and refused to take possession and make payment at the place where the seller had attempted to make delivery, the vendor had the right to resell the property to minimize the damages; and he may recover the difference between the contract price and that received on the resale, with his costs and expenses in reselling.

Deemer, J., concurring.

*Appeal from Page District Court.*—HON. THOMAS ARTHUR, Judge.

TUESDAY, APRIL 8, 1913.

PLAINTIFF brought suit against defendant to recover damages for breach of a parol contract for the sale of certain sheep. The defendant relied on the statute of frauds, and claimed that plaintiff was not the real party in interest, and therefore could not maintain a suit, and some other matters which will be noticed in the opinion. Trial to a jury. At the conclusion of plaintiff's evidence the court directed a verdict for defendant. Plaintiff appeals—*Reversed.*

*Lambert, Shotwell & Shotwell* and *T. F. Willis,* for appellants.

*E. R. Ferguson* and *C. R. Barnes,* for appellee.

PRESTON, J.—The evidence tends to show that on September 6, 1911, plaintiff, a copartnership, was engaged in the business of sheep commission merchants at the Union Stockyards, South Omaha, Neb., and were handling sheep exclusively on commission; that plaintiff has pens allotted to it for

use by the Stockyards Company. They are not lessees of the
pens, but have use of them by virtue of doing business at
the yards. The yards and pens are owned and controlled by
the Stockyards Company. The scales at the yards over which
all stock is weighed are owned and controlled by the Stockyards
Company, which employs a weighmaster. The commission
man has no authority or control over the scales or weigh-
master. After the stock is weighed out to the purchaser,
it is taken by the employees of the Stockyards Company, and
placed in pens through the yards, which are under the con-
trol of said company, and over which the commission man
has no control. The Stockyards Company also owns and
controls all the trackage in the limits of the yards. On said
date the plaintiff had for sale certain lambs in the pens al-
lotted to it at the stockyards, which had been consigned to
them to sell by a party in Idaho. About 10 o'clock in the
·morning·of that date, the defendant came to the pens of
plaintiff, and, after looking at the lambs, priced a car load
of them, and when told by plaintiff's salesman that they
were five cents per pound said: "All right, I will take them.
Get them out, and weigh them." Defendant asked the sales-
man if he would bill them out for him if he purchased a
load, and was informed by the salesman that he would, but
defendant did not tell the salesman where to bill them, and
gave no billing directions. The salesman then turned to a
yardman and, in the presence of defendant, directed the
yardman to count out a load of the lambs for defendant. The
yardman immediately counted out a load of 334 of said lambs
in the presence of defendant. The lambs were counted out of
the flock in the pens, and let into an alley leading to the scales,
which were distant about one hundred and twenty-five feet.
The yardman then drove the lambs up the alley to the scales.
At the scales another employee of plaintiff was stationed to
receive the lambs and place them on the scales as they were
driven up. Defendant followed the lambs to the scalehouse,
and was present at the time of, and saw, the weighing, and

saw them driven from the scales, and gave in his name as the purchaser of said lambs. The lambs were put on the scales and weighed by the Stockyards Company's weighmaster. The defendant's name appears on the scale tickets as purchaser. After the lambs were weighed they were driven from the scales by employees of the Stockyards Company, and placed in the pens of the said company.

The plaintiff offered to show that in case of a sale, as in this particular instance, plaintiff has nothing to do with the billing or shipping out of the animals after they are weighed out, and that, if they do so, it is only a matter of courtesy to the purchaser and after request is made by him. There is evidence in the record, however, tending to show that, after the lambs were weighed and placed in the pens of the Stockyards Company, the plaintiff had nothing further to do with them. It was the duty of plaintiff's employee, who was stationed at the scale-house, to give the name of the commission firm and the purchaser to the weighmaster, which he did. At about 10:30 o'clock in the same forenoon, and after the lambs had been weighed, defendant went to plaintiff's office, and told the bookkeeper that he had bought a load of sheep that morning, and asked if his bill was ready; he was informed that the official scale ticket had not been sent up, so that he could not make up the statement. Defendant produced a card on which he said he had taken the weights and the number of head and price, and that he had a check on his country bank to pay for the lambs. The bookkeeper told defendant to wait until he could get the scale ticket from the yards, and he would make up his bill. About 2 o'clock in the afternoon of that day defendant met a party and told him he had bought some lambs of Smith, and that they were the same lambs he had looked at with the witness in the forenoon. About 3 o'clock defendant went to the pens of plaintiff again, and asked the salesman if they could *sell the lambs for him.* The salesman replied he thought he could, but that defendant would have to wait a minute before

·he could talk to him about it, as he was busy with another customer. A few minutes later defendant came up to the salesman, and said, "I do not know that I want those lambs," and the salesman told him if he would wait a minute he would talk to him about it. That was the last seen of defendant. He failed to take the lambs from the stockyards, and failed to pay the purchase price.

The next day, September 7th, plaintiff caused a telegram to be sent to defendant, notifying him that the lambs would be resold on his account unless he advised to the contrary; and, if resold, they would charge him with any loss between purchase price and amount realized on resale, together with feed, commission, and other expenses. The record does not show the receipt of this telegram by defendant.

On September 8th the lambs were brought back to the pens of plaintiff to be resold. In the interval between the time of the alleged sale to defendant on the 6th and September 8th the lambs had been in the pens of the Stockyards Company. On September 8th they were offered for sale in plaintiff's pens, and were sold in the market at the best price obtainable, which was less than the price it is alleged defendant agreed to pay. The lambs were resold at a loss of $107.33, and plaintiff paid out $1.76 for the telegram, and a charge was made for feed consumed by the lambs between the date of the first sale and the resale and a commission.

As bearing on the question of delivery and acceptance, plaintiff offered to show by different witnesses what the usual and ordinary course of business is, and was, at the stockyards in question in reference to how the transactions are handled from the time a bid is made on stock until it is taken from the scales, and where placed after being weighed, and that, after being weighed, it is placed in the pens of the Stockyards Company to be held for the purchaser until he takes it away, or otherwise disposes of the same, and that the delivery in the transaction with defendant was handled in the ordinary and usual way. This evidence was objected to by defendant as

seeking to establish a fact by custom, and that it is not shown that defendant had any knowledge or information of the particular custom in question. The court sustained the objections. The court did permit plaintiff to read from the deposition of one witness that, after sheep are weighed, the Stockyards Company has charge and takes care of them after that, and that the sheep are locked up, and nobody can get in and touch them unless an order is given. This witness was an employee of plaintiff, and he said that he might give an order to somebody to go and get the sheep, but that they were under bond to protect the yard company. We have considered it necessary to set out the evidence somewhat in detail, in order that the questions involved may be better understood.

I. Counsel for appellee contends that plaintiff cannot maintain this action for the reason that it was acting for another, and is not the real party in interest.

1. COMMISSION
MERCHANTS:
sales: breach
of contract:
right to sue.

The lambs were shipped to plaintiff to sell on commission by a person in Idaho. The alleged contract of sale was made between plaintiff and defendant, and the name of plaintiff's principal was not disclosed. It may be that as between plaintiff and its principal there would be a duty on plaintiff's part to account to the principal for any recovery herein, if that has not already been done. Plaintiff is a factor, and as such, unless there is some objection on the part of its principal, or unless the principal intervenes, may sue in its own name and recover damages for a breach of the contract, or to recover the purchase price. 19 Cyc. 183; *Brown v. Sharkey,* 93 Iowa, 157; *Shelby v. Burrow,* 76 Ark. 558, (89 S. W. 464, 1 L. R. A. (N. S.) 303, 6 Ann. Cas. 554); *Kelsea v. Ramsey,* 55 N. J. Law, 320, (26 Atl. 907, 22 L. R. A. 415); *Beardsley v. Schmidt,* 120 Wis. 405, (98 N. W. 235, 102 Am. St. Rep. 991).

Plaintiff could make a valid contract with defendant without disclosing its principal. Defendant could look to plaintiff individually for performance of the contract; this

liability being reciprocal, defendant is liable to plaintiff for its performance. In contemplation of law plaintiff is, under the facts here shown, the real contracting party to whom the promises of defendant were made, and who is entitled to enforce them.

But it is said for appellee that plaintiff has paid to his principal the full amount of the purchase price, and that it was a voluntary payment for which plaintiff may not now recover. This question seems to have been raised for the first time in this court. There is no pleading in regard to it, nor is it referred to in defendant's motion to direct a verdict. The record is that after plaintiff had rested, and after defendant had made his motion for a directed verdict, but before the ruling thereon, plaintiff was given leave to recall one of its witnesses, a member of the firm, to show that the sheep in controversy were consigned to plaintiff direct. On redirect examination two questions were put and answers given, showing that plaintiff settled with its principal on the basis of the sale to defendant, and paid the full purchase price. This is the entire record on this subject. After that defendant renewed its motion without again setting out the grounds. The general rule is, of course, that one voluntarily paying a claim is not entitled to recover it back. We think defendant cannot urge that matter for the reasons above given, and others.

2. SAME: breach of contract: defenses: review on appeal.

It does not appear when plaintiff paid the shipper. It may have been at once or soon after the sale by plaintiff to defendant, and before defendant repudiated the contract. The payment did not include the expenses of reselling. Furthermore, that was a matter between plaintiff and its principal, and no affair of the defendant. If plaintiff is required to account to the Idaho man, its principal, after a recovery, if any, he could do so before. Plaintiff could have taken an assignment perhaps, but we think it was not necessary because the contract was in plaintiff's name, and it had a special

property in the sheep consigned to it, so that it could sue in its own name.

II.    Appellant contends that the trial court erred in refusing to permit it to show the usage or manner of doing

3. SAME: usage of business: delivery: evidence.

business at the stockyards in question as bearing on the question of delivery. A part of plaintiff's evidence was taken by the witnesses appearing in court and a part by depositions. Plaintiff sought to show such usage by three or four witnesses. To this line of evidence defendant objected that it called for a custom which had not been pleaded, and that defendant, not being a resident of the state, could not be held to know of such custom. Some evidence of this kind was permitted, but not as fully as it should have been. The objections were generally sustained.

A witness for plaintiff whose deposition had been taken testified that for three years he had been yardman for plaintiff at the stockyards, and was then asked this question:

Q. Mr. Taylor, will you explain the course of business in the Union Stockyards at South Omaha, Neb., when lambs or sheep are sold by commission concerns to the purchaser, as to what is done with the lambs? Just explain the process. What steps are taken? (The objection sustained.)

Plaintiff then made the following offer: Plaintiffs now offer to show by this witness, if permitted to answer, the following: 'Well, sir, when a bunch of sheep or lambs is sold to the purchaser, they are sent to the scales and weighed by the man employed by the Union Stockyards Company; the weight of these lambs is put down on these scale tickets; they are then counted off the scale by another employee of the Union Stockyards Company, and the count is put down opposite these weights; these sheep are then in the hands of the Union Stockyards Company until such time as the purchaser takes them out of their hands, either to deliver them to the railroad company or to drive them out of the yards themselves; this weighing of the sheep is as far as the commission firm goes with them; after they leave the scales they are out of our hands.'

Mr. Barnes: We except to the offer for the same reasons as made to the question.

The Court: Sustained. (Plaintiffs except.)

Similar offers were made as to other witnesses. In excluding such evidence the court erred. Such witnesses should not, of course, be permitted to state their conclusions as to whose sheep they were after a certain thing was done, or what was a delivery, or the like, but should have been allowed to state the way the business was usually done. The questions and offers did not call for evidence of custom, strictly speaking, but, rather, usage of the business, and what was usually done under such circumstances. It was not necessary to plead such a usage. *Thayer v. Coal Co.*, 121 Iowa, 121; *Carter v. Sioux City Service Company*, (Iowa) 141 N. W. 26.

A party dealing in a particular market is presumed to know all customs of that market bearing upon the transaction in question. *Cothran v. Ellis*, 107 Ill. 413; *Bailey v. Bensley*, 87 Ill. 556; *Long v. Armsby Co.*, 43 Mo. App. 253; Jones, Evidence (Pocket Ed.) section 57. This evidence had a bearing on the question of delivery, and was offered for that purpose. If defendant had bought one sheep of a farmer, there could have been actual manual delivery by tying a rope around the animal's neck and handing the rope to the buyer, or he could turn the one sheep out in the road and let the buyer drive it home. In this case the evidence shows that plaintiff handled twenty-five cars of sheep daily; that there were other commission men handling sheep, cattle, and hogs. Defendant was present at the yards' at the time he bought these lambs, and could see at a glance the large number of animals in the different pens. He must have known that it was necessary to have some method by which animals, when purchased, could be separated and delivered by the seller to the buyer without actual manual delivery of the property. It was proper to show how this was done; that the

sheep were at first in plaintiff's pens, then weighed and turned into other pens over which plaintiff had no control, and like incidents of the business in which defendant was then engaged, and in the market where he was buying.

III.   The real question in the case is whether there was such a delivery of the property as to take the case out of the statute of frauds, or, rather, whether the evidence was sufficient to take the case to the jury on that issue.   On the merits of the question as to whether there was in fact such delivery we express no opinion.   That is for the jury, and we hold there was a jury question here.   There is another matter which should be first noticed.

The alleged contract was made in Nebraska.  Defendant pleaded the statute of frauds of Nebraska, but there is

4. FOREIGN
   LAWS : pre-
   sumption.

no proof on that point.   It is claimed by appellant in argument that the statute of Nebraska was a matter of defense, and defendant offered no proof as to the laws of that state, and this court will not take judicial notice of them, hence there is nothing before the court to show that the contract was not a valid one where made, and cites in support of his proposition: *Varner v. Interstate Exchange,* 138 Iowa, 201.   The point is not well taken.   In that case the question, stated briefly, was this:   Whether there had been a failure of title to land in Missouri by reason of a foreclosure by notice and sale.   There was no evidence that under the laws of Missouri such a foreclosure and sale would pass title.   In this state such foreclosure must be in equity, and, as we have no such law as foreclosure of a real estate mortgage by notice and sale, the court held to the presumption that the law in Missouri was the same as Iowa, in the absence of proof.   In Iowa we do have a statute of frauds; and in the absence of evidence the presumption obtains that the Nebraska statute is the same as ours.   This is familiar doctrine.   The next trial may be on a different theory, but this appeal must be determined on questions now raised.

IV. Was the evidence sufficient to take the case to the jury on the theory that there was such a delivery of the

5. SALES: stat-
ute of frauds:
delivery: evi-
dence.

lambs as to take the contract out of the statute? As to what is required to constitute a delivery of personal property in order to take a contract of sale out of the statute of frauds but two of our own cases are cited, and we are unable to find any others. There are other cases involving the question of delivery in sales of personal property, some of which have some bearing on the question here. We shall refer to some of them.

The term "delivery" is used in the law of sales in very different senses, being used in some instances to denote a

6. SAME.

change of title, and in others to denote change of possession. 35 Cyc. 164. What constitutes a delivery depends largely upon the character and situation of the property. In *Willey v. Backus*, 52 Iowa, 401, the gift of a piano was alleged, but it was held there had been no delivery because there was no evidence that the party claiming the gift was given dominion over the piano. The opinion refers to *Brown v. Wade*, 42 Iowa, 647, and states that in that case "dominion over the cattle was given by the seller to the purchaser, and this was all that was required." That was a case involving delivery under the statute of frauds and will be again referred to.

In *Dysart Bank v. Weinstein*, 152 Iowa, 260, the question was as to delivery of a mass of eighty-five tons of scrap iron under the statute regarding conditional sales. The case has some bearing as to what is necessary to constitute a delivery because of the character and situation of the property.

*Welch v. Spies*, 103 Iowa, 389, involved the question of delivery of corn in crib which had not been weighed or measured, and whether the title passed, even though something remained to be done to fix the rights of the parties, and the court said that the intent of the parties is of controlling importance, citing again, among other cases, *Brown v. Wade*, 42 Iowa, 647, to which we shall now refer. That was

a case involving the question as to whether there had been such a delivery of cattle as to take the sale out of the statute of frauds. The seller pointed out certain cattle of his which were running with others in the pasture and designated their price, which the purchaser agreed to take as they were, and at the stipulated price. These facts were held sufficient to take the sale out of the statute, the court saying:

Nothing more should be required than what is usual, convenient, and proper. . . . All that was necessary to complete the sale was that the right of dominion over them should be transferred from Brown to Davis. To this end it could not be necessary that Davis should take them into his manual custody, and drive them off the range, or remove them to another part of it. The interest and the convenience of the purchaser required that the cattle should remain where they were, and he had the right to leave them there. It was only necessary that the cattle should be pointed out, that Brown should agree that Davis might have them in part pay for the land, and that Davis should agree to take them as such payment where they were and as they were, and then the delivery was complete. Davis might afterward, without any further act or consent of Brown, take the cattle into his manual custody, and if they had died, or been stolen, before such manual custody was complete, there can be no doubt that Davis would have been obliged to bear the loss.

So in this case the cattle had been driven to the scales, been separated, turned into other pens over which plaintiff had no control, and so far as the evidence shows all the defendant had to do was to go and get his lambs. The evidence was excluded as to the usual method of disposing of the lambs after they were turned into the company's yards from the scales, so that it does not appear as to how payment would be made by the defendant, or how they would be billed out or shipped.

In *Thompson v. Frakes,* 112 Iowa, 585, the only other Iowa case involving the question of delivery under the statute of frauds, it was held that the question of intent was a

factor always to be considered. Decisions of other states are cited and argued in which the words ''accept and receive,'' are construed, and as to what is an acceptance and a receipt. It should be noted that the English statute provides, in substance, that no sale of personal property shall be good ''except the buyer shall accept part of the goods so sold and actually receive the same.'' The statutes of many of our states are similar, while our statute provides that evidence is not admissible when ''no part of the property is delivered,'' etc. There may be no great distinction in this respect, but there is some. Delivery does involve acceptance in a sense, to this extent, intent to take the property, and the right to exercise dominion and ownership over it. Some of the cases in other states go so far as to hold that there must be some unequivocal act on the part of the vendee indicating an acceptance after the vendor had performed what his oral agreement called for, and that such acts must relate to some dealing with the property itself after the delivery. Our cases have not gone so far, and we think under our statute it is not necessary to do so.

On this question of receipt and acceptance we find a recent case, which has not been cited, but which states the rule so clearly we shall quote from it. The case is *Beedy v. Brayman Co.,* 108 Me. 200 (79 Atl. 721, 36 L. R. A. [N. S.] 76), where it is said:

There may be a complete delivery at common law without either receipt or acceptance under the statute. The former is the act of the vendor; while receipt, which affects the possession, and acceptance, which affects the title, are the acts of the purchaser, and both receipt and acceptance are essential. Nor can such receipt and acceptance be shown by words alone, where such words are part of the alleged oral bargain and sale. But receipt and acceptance need not be contemporaneous with the alleged contract, if made in pursuance of it; nor need they be simultaneous. The former may precede or follow the latter. No act of the vendor alone can be effective to make delivery, without receipt and acceptance,

and take the case out of the statute. If the vendee does any act to the goods of wrong if he be not their owner, and of right if he be their owner, the doing of the act is evidence that he had accepted them. These principles are so well established as to require no citation of authorities.

That is a *Maine* case, under a statute which, we take it, is similar to the English act. The case last cited goes to the extreme, perhaps in one respect, in holding that an offer by the vendee to sell to a third person was sufficient of itself to take the sale out of the statute.

The question as to whether the vendor has or has not lost his lien has not been considered in any of our cases. The decision in *Brown v. Wade, supra,* has never been questioned. Intent to pass title, with dominion, or the right of dominion over the property transferred to the purchaser, is a sufficient delivery, under our statute and decisions, to take the sale or contract out of the statute of frauds.

In the case at bar the transaction and sale were negotiated in a public market; the vendors, it would seem, did everything they could do toward complete delivery. The evidence shows that after the lambs were weighed defendant asked plaintiff's salesman if he could sell the lambs for him (defendant). This, with the statement by defendant to the witness Powell that he had bought the lambs, his going to the office to pay for them, the fact that after weighing them they were put into pens over which plaintiff had no control, and the other circumstances shown, was clearly enough to take the case to the jury.

V. As to the plaintiff's right to resell. Plaintiff did not retake possession of the property as its own, or with the intention of rescinding or abandoning the sale, at least it would be a question for the jury whether or not it did so. Nor does plaintiff claim to have taken and resold the property under a lien. The claim is that there had been a completed sale and delivery; that title had passed to defendant; that thereafter

7. SAME: breach of contract: right to resell.

defendant abandoned the lambs and plaintiff resold them as a matter of necessity; that it was its duty to resell them to minimize the damages sustained by defendant's conduct, and in reselling the lambs plaintiff did so as agent, or trustee, by necessity for the defendant. In 35 Cyc. 520, 521, the rule is stated in this way: "The rule is well settled that, where the goods are in his possession, the seller may, without committing a breach of the contract, resell the goods, if the original buyer refuses, without justifiable cause, to receive and pay for them, and may recover the loss sustained in the difference between the contract price and the price received on resale, the expenses of making the sale, and, in addition, the cost of storage, interest, and an allowance for his time as agent in reselling." See, also, *Vanstory Clothing Co. v. Stadiem,* 149 N. C. 6 (62 S. E. 778); *McMillan v. Heaps,* 85 Neb. 535 (123 N. W. 1041); *Armsby Co. v. Raymond,* 90 Neb. 553 (134 N. W. 174); *Devine v. Warner,* 76 Conn. 229 (56 Atl. 563); *Gilly v. Henry,* 8 Mart. (O. S.) 402 (13 Am. Dec. 291). The rule that vendor may resell applies to cases where the title has passed as well as to executory contracts of sale. *Van Brocklen v. Smeallie,* 140 N. Y. 70 (35 N. E. 415); *McMillan v. Heaps, supra; Vanstory Clothing Co. v. Stadiem, supra; Devine v. Warner, supra.* It appears in the case at bar, that two days after it is claimed defendant abandoned the lambs the Stockyards Company turned the lambs back to plaintiff, or plaintiff took possession of them, after sending defendant a telegram that it would do so, and sell to his account. The fact that the question of delivery under the statute of frauds is involved does not change the rule as to this matter of reselling, for the reason that, if there had been such a delivery as to take the sale out of the statute, there was a valid contract just the same as though the statute of frauds was not in question. The sale would then be the same as any other sale of personal property.

For the errors pointed out, the judgment is *Reversed,* and the case *Remanded.*

---

DEEMER, J. (concurring).—I agree to the conclusion, but do not agree to the holding that testimony of the local custom at the stockyards was admissible; it not appearing that defendant had any knowledge of such custom. So far as shown he was a stranger to the customs. Testimony of such local custom should not be admitted for the purpose of showing a delivery to satisfy the statute of frauds; if not offered for that purpose, it was not admissible at all. The only issue to which it could relate was whether or not there was such a delivery as satisfied our statute of frauds. I think there was testimony of such delivery, but I am impressed that testimony of a local custom which will now be accepted upon a retrial will lead to error and confusion and perhaps erroneous instructions as to effect of local custom. In support of my view, see *Rindskoff v. Barrett,* 14 Iowa, 101.